UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

UNITED STATES OF AMERICA,

Plaintiff,

v.

DALE ALEXANDER PRENTICE, et al.,

Defendants.

CASE NO. CR06-296C

ORDER

This matter comes before the Court on Defendant Visa El's Motion to Suppress (Dkt. No. 153), Defendant Ibrahim Abdul El's joinder therein (Dkt. No. 154), Defendant Hao Quang Tran's Motion to Suppress (Dkt. No. 155), and the Government's Opposition to these motions (Dkt. No. 162).  Having reviewed the papers on the motions and the parties having waived a hearing on this matter, the Court hereby finds and rules as follows.

I.      FACTS

        The following facts are summarized from the Government's expected evidence as presented by all parties.  In March 2006, an individual seeking to rent a warehouse that could accommodate a tractor-trailer contacted an informant, who then met with Dale Prentice—a Defendant in this action but not a movant here—to arrange the rental.  The informant and Prentice met on May 26, 2006 to discuss this

ORDER – 1

arrangement again.  Prentice did not want his names on any paperwork for the warehouse and wanted the informant to set up the rental and give him the keys.  Prentice said that a large amount of money would be involved for him and the informant if the rental was successful, and promised $8,000 to $10,000 per month to the informant.

On June 12, 2006, Immigration and Customs Enforcement ("ICE") agent Jay Ingersoll met with Prentice, posing as someone who would sign a lease for the warehouse in the name of his construction business in exchange for $160,000 in U.S. currency for the rental cost.  Prentice informed Ingersoll that, with the addition of Ingersoll and others to the plan, the fee promised the informant would have to be split up between them.  Prentice further said that he could pay Ingersoll $20,000 up front, rather than the $48,000 Ingersoll had requested, and that he could pay the rest in approximately three months, when he and his organization started making money.  Prentice assured Ingersoll that his "company" name would not be used on any paperwork other than the lease.  The two then discussed the specifics of the warehouse configuration and whether there would be windows on the doors.  When asked by Ingersoll whether anything hazardous would be brought into or stored in the warehouse, Prentice said no, and assured Ingersoll that nothing would be stored there at all.  Rather, the use would be that a food truck would back in, be "broken down" and then they would remove their "stuff" and the truck would leave the warehouse.  The two discussed the amount of cash that Prentice would be leaving with Ingersoll that day. Prentice said he was giving Ingersoll three "fifty packs" ($50,000 each) and a "ten pack" ($10,000), equaling the $160,000 needed for renting the warehouse.  This money (final count equaling $160,100) was deposited in the bank, and Ingersoll signed a one-year lease for $85,000 for the warehouse at 12315 Mukilteo Speedway in Mukilteo, Washington.

On June 13, 2006, Ingersoll met with Prentice to deliver the keys and receive his fee for using his "company" name on the warehouse lease.  Prentice offered $60,000 to split among the people who helped get the warehouse and said that his "money guy" in California had given him $20,000 to deliver that day.  He also said that his organization would not be using the warehouse that often—two to three

ORDER – 2

times per week—and that they always would be there during daytime hours.  Again, he said they would back the truck in, close the door, unload for a few hours, and then leave, and that nothing would be stored there to his knowledge.  Prentice went to get a bag but, according to Ingersoll, returned nervous and sweaty.  Apparently, Prentice had seen firefighters inside the store and thought they were police officers because police officers in Canada dress similarly to firefighters in the United States.

On June 14, 2006, a tractor-trailer semi-truck arrived at the warehouse, having crossed the United States–Canada border at 8:57 that morning.  The semi backed in, dropped off the trailer, and then departed.  Michael Britton, also a Defendant in this matter, was at the warehouse at the time and opened the door.  He has not been seen since June 27, 2006.

On June 15, 2006, beginning at 9:23 a.m., Britton drove six different cars and passenger trucks to the warehouse.  The first was not driven into the warehouse, but Britton loaded something into the rear of the vehicle.  Britton drove the other five vehicles into the southern bay of the warehouse and closed the door.  Each car was in the warehouse for approximately six minutes.  Britton drove each one away, returning with another.  Britton drove the last car away at 2:25 p.m.  Agents watched a film of these events after the fact.

On June 16, 2006, a Canadian-licensed semi without a trailer drove into the warehouse lot at 6:15 p.m. after having crossed the United States–Canada border at 12:30 p.m. that day.  At about 6:45 p.m., Britton opened the south-facing door, the semi backed in, and departed pulling the same trailer that had been left there two days prior.  Britton closed the door and drove away.

On June 21, 2006 around 12:00 p.m., a different Canadian-licensed tractor-trailer arrived at the warehouse, pulled in, and left the trailer inside, leaving at 12:22 p.m.  Britton was there and had opened the door for the tractor-trailer to enter.  Between 8:15 p.m. and 12:30 a.m. the morning of June 22, 2006, eight different vehicles entered and left the warehouse.  They were all driven by Britton.  Each was in the warehouse for five to ten minutes.  Agents followed, but did not stop or search these vehicles.  They did, however, identify one of the vehicles' owners as Phuoc V. Nguyen, who had been arrested on December

ORDER – 3

18, 2001 while attempting to pick up approximately 350 pounds of marijuana and was convicted in Oregon.  Britton drove one of the cars to the side door of the warehouse instead of inside.  He then loaded two large Canadian hockey bags into the trunk.  The ICE agents suspected that these Canadian hockey bags, without accompanying hockey players, contained marijuana.  Britton also handled a smaller bag, but agents could not tell whether it came from inside or went into the warehouse.  Agents then watched Britton leave the warehouse several times in different vehicles, returning each of them to a different person.

On June 23, 2006, agents requested a "sneak and peek" warrant, which acknowledged that agents did not know what was being smuggled into the United States or distributed from the warehouse, but stated that Prentice was suspected of money and marijuana smuggling.  On June 24, 2006, agents executed the warrant at the warehouse, finding metal and plywood in eight-foot square sheets, tools, including saws and grinders, pry bars, hammers, metal chisels, protective goggles, and earplugs.  There was a scrap of paper in the garbage that said "Green 80," which the agents apparently suspected signaled a grade or type of marijuana.  Agents believed that the sheets of plywood and metal had been pulled off of the walls of the containers on trailers brought into the warehouse.  These containers were old refrigerated shipping containers that had crossed the border appearing empty.  Because they were empty, they were not searched.  Agents suspected after their surreptitious search that the organization was replacing insulating material in the walls of the refrigerated shipping containers with contraband, likely marijuana, and then removing it in the warehouse.  Border records indicated that Britton had crossed into the United States on June 13, 2006 and June 21, 2006.

On June 27, 2006, another Canadian-licensed tractor-trailer brought a new trailer and took away the one that had been at the warehouse since June 21, 2006.  Agents saw Britton and his car at the warehouse that afternoon.  Around 5:50 p.m. Britton drove away in his own car after spending a couple of hours in the warehouse.  Around 6:35 p.m. he returned, driving Defendant Visa El's car, a Montero. This was the first of seven cars that Britton ferried to and from the warehouse that night.

ORDER – 4

Agents had seen Britton pick up the car from Defendant El at the Alderwood Mall in Lynnwood, Washington. Britton drove the car into the warehouse, left after seven minutes, returned to Alderwood Mall, and returned the keys to Defendant Visa El. Defendant Visa El and his nephew Defendant Ibrahim Abdul El then entered the vehicle and drove away. The police and Washington State Patrol stopped the car shortly thereafter. A police dog apparently reacted positively to an odor in the car and the two were arrested and removed from the car.[1] Ninety-nine pounds of marijuana were found in six plastic garbage bags in the car's rear. Defendants Visa El and Ibrahim Abdul El were booked into the Bellevue Police Department and later released pending further investigation.

Defendant Hao Quang Tran's Ford Mustang was the fifth of the seven cars driven to and from the warehouse by Britton and later stopped and searched on June 27, 2006. Britton loaded Defendant Tran's car around 9:20 p.m. at the warehouse and returned it to him at a McDonald's restaurant at the Alderwood Mall before 10:00 p.m. At that time, Defendant Tran and another Defendant in this matter, Tam Phu Quy Nguyen, got into the Mustang and drove it to an apartment complex in Tukwila, Washington. The car was followed and stopped by law enforcement as it entered the parking lot at the apartment complex. Both Defendants Nguyen and Tran were arrested and booked into the Renton Police Department. Police searched the trunk of the vehicle and found four bags of marijuana.

After the stops and searches of all seven cars that were driven by Britton from the warehouse on June 27, 2006, it was apparent that each car had between fifty and one hundred pounds of marijuana, packaged in large plastic garbage bags spray-painted different colors. No person other than Britton was seen at the warehouse.

Agents obtained a warrant to search the warehouse on July 11, 2006. In their request and affidavit, they described the purpose of the stops made on June 27, 2006 as to "confirm that marijuana

---

[1] Defendant Visa El's motion orders the facts this way. However, Defendant Ibrahim Abdul El's motion claims that the police dog did not react to the odor until *after* they were arrested and removed from the car. The Court addresses the irrelevance of this factual discrepancy *infra* section II.A.

ORDER – 5

1  was being dealt out of the warehouse, to determine the amount, and to learn the identity of the

2  customers."

3  On July 13, 2006, agents wrote the report on their June 24, 2006 surreptitious search of the

4  warehouse.  The report acknowledged that execution of the warrant had helped them identify the method

5  of smuggling used by the organization that they had been watching—replacing refrigerator container

6  insulation with marijuana so that the container would appear empty at the border.

7  Defendants Visa El and Ibrahim Abdul El move to suppress the evidence seized from Visa El's

8  Montero on June 27, 2006 on the basis that there was no reasonable suspicion for law enforcement to

9  make the stop.  Defendant Hao Quang Tran moves to suppress the evidence seized from his Ford

10  Mustang on June 27, 2006 on the basis that there was no probable cause to search, and even if probable

11  cause existed, a warrant was required to search the trunk.

12  **II.     ANALYSIS**

13  The Fourth Amendment of the United States Constitution requires stops, arrests, and searches to

14  be reasonable.  Evidence obtained as a result of an illegal stop, arrest, or search must be suppressed as

15  fruit of the poisonous tree.  *Wong Sun v. United States*, 371 U.S. 471, 484–85 (1963).

16  **A.     The Montero**

17  Defendants Visa El and Ibrahim Abdul El argue that there was no reasonable suspicion justifying

18  the police stop of the Montero.  The Government argues that there was not only reasonable suspicion to

19  stop, but also probable cause to arrest and search.  The Court agrees with the Government.

20  Under *Terry v. Ohio*, 392 U.S. 1 (1968), law enforcement officers must have at least a reasonable

21  suspicion of criminal activity before stopping a suspect.  *United States v. Morales*, 252 F.3d 1070, 1073

22  (9th Cir. 2001).  "Reasonable suspicion requires specific, articulable facts which, together with 'objective

23  and reasonable' inferences, form a basis for suspecting that a particular person is engaged in criminal

24  conduct."  *United States v. Thomas*, 211 F.3d 1186, 1189 (9th Cir. 2000).  This is a fact-intensive inquiry

25  that must evaluate the "totality of the circumstances."  *United States v. Montero-Camargo*, 208 F.3d

26  ORDER – 6

1   1122, 1129 (9th Cir. 2000).

2        In contrast, warrantless arrests and searches require probable cause.  *See United States v. Martin*,

3   509 F.2d 1211, 1213 (9th Cir. 1975) (warrantless arrests); *United States v. Baker*, 567 F.2d 924, 926–27

4   (9th Cir. 1978) (searches incident to arrests); *United States v. Pinela-Hernandez*, 262 F.3d 974, 978 (9th

5   Cir. 2001) (warrantless searches of automobiles).  The probable cause inquiry is more exacting than the

6   test for reasonable suspicion.  *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (citing *United States v.*

7   *Montoya de Hernandez*, 473 U.S. 531, 541, 544 (1985)).  Probable cause requires a finding that there

8   exists a "fair probability that contraband or evidence of a crime will be found in a particular place,"

9   *Illinois v. Gates*, 462 U.S. 213, 238 (1983), or information "sufficient to warrant a prudent [person's

10   belief] that the [arrested person] had committed or was committing an offense," *Beck v. Ohio*, 379 U.S.

11   89, 91 (1964).  While the standards themselves are different, the probable cause test—like the reasonable

12   suspicion test—is dependent on an evaluation of the "totality of the circumstances."  *Gates*, 462 U.S. at

13   238.  Previous surveillance indicating that a vehicle may contain contraband constitutes probable cause.

14   *See, e.g.*, *Pinela-Hernandez*, 262 F.3d at 978–79.

15        Defendants Visa El and Ibrahim Abdul El argue that no reasonable suspicion existed to stop their

16   car because they were not at the warehouse.  However, the surveillance had indicated quite clearly that

17   the pattern involved in transferring material from the warehouse to individual cars was that only Britton

18   would drive cars to the warehouse, stay inside for five to ten minutes, and then deliver the vehicles to

19   parties waiting elsewhere.  This procedure occurred repeatedly.  In addition, agents knew that large

20   amounts of cash coming from a "money guy" in California were associated with people having access to

21   the warehouse; agents had seen Britton loading Canadian hockey bags from the warehouse into one car

22   (apparently signaling marijuana); agents had observed Britton engage in the same pattern of loading cars

23   on June 15, 2006, June 21, 2006, and June 27, 2006 when the vehicles involved were finally stopped after

24   Britton delivered them to others; and agents identified one vehicle transferee on June 21, 2006 as a

25   convicted marijuana trafficker (Phuoc V. Nguyen).  Moreover, while agents did not discover marijuana in

26   ORDER – 7

their June 23, 2006 "sneak and peek" search, they found tools and materials suspected of aiding

contraband concealment and a piece of paper with the words "Green 80" (apparently indicating to them

marijuana was likely the reference).  Agents also knew the tractor-trailers coming and going to the

warehouse were Canadian-licensed, which could signal cross-border drug trafficking.  Most importantly,

agents observed Britton hand over the keys to Defendant Visa El at the Alderwood Mall.  Perhaps none

of these facts individually could support probable cause or even reasonable suspicion, but when

combined—*i.e.*, when considered in the totality of the circumstances—they constitute both.  The stop

was justified by probable cause (and accordingly reasonable suspicion); the arrest and search were

justified by probable cause.

Both Defendants Visa El and Ibrahim Abdul El point to the use of the police dog after they were

stopped as evidence that reasonable suspicion was lacking.  This fact cannot, however, negate the

probable cause that existed before the vehicle was ever stopped and before a police dog could have

approached the car.  Accordingly, the police dog merely confirmed what the officers already suspected

and identified the object of the previously obtained probable cause.  Finally, Defendant Ibrahim Abdul

El's contention that the police dog did not react to the odor until after they were arrested is also

irrelevant.  Because there was probable cause to arrest the two at the time the stop was made, the use of

a police dog thereafter cannot be said to invalidate the arrest.

For the foregoing reasons, Defendants Visa El and Ibrahim Abdul El's motions to suppress the

marijuana seized from the Montero are DENIED.

**B.     The Mustang**

Defendant Hao Quang Tran argues that (1) the search of the trunk of his Mustang was not

supported by probable cause and (2) even if probable cause existed, a warrant was required prior to the

search because this situation does not fit the "automobile exception" to the warrant requirement.  The

Government disputes this, arguing that probable cause was abundant and that the search of the trunk did

not require a warrant.  The Court agrees with the Government.

ORDER – 8

1    The probable cause standard is recited *supra*.  With respect to the challenged trunk search here,

2    the following additional law is relevant.  The Ninth Circuit has noted that the "Supreme Court has held

3    that police may conduct a warrantless search of a vehicle if they have probable cause to believe that it

4    contains contraband." *Pinela-Hernandez*, 262 F.3d at 977–78 (citing *Carroll v. United States*, 267 U.S.

5    132 (1925); *United States v. Ross*, 456 U.S. 798, 799 (1982)).  This constitutes the "automobile

6    exception" to the warrant requirement.  *Id.*  Moreover, "[i]f probable cause justifies the search of a

7    lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may

8    conceal the object of the search." *Ross*, 456 U.S. at 825.  Relying on *Ross*, the *Pinela-Hernandez* court

9    held that "[b]ecause there was probable cause to search the car, there was probable cause to open the

10   trunk and to search the packages that turned out to contain marijuana." 262 F.3d at 979.  Accordingly, if

11   probable cause existed to search the Mustang, probable cause existed to search the trunk without a

12   warrant.

13   The same chain of events and "totality of the circumstances" relevant with respect to the stop of

14   the Montero are relevant as to the Mustang.  Thus, for the same reasons that the Court found probable

15   cause to stop and search the Montero, the Court finds that there was probable cause to stop and search

16   the Mustang.  The Montero was the first car Britton loaded with marijuana on June 27, 2006; the

17   Mustang was the fifth.  The stop of the Montero occurred first.  Accordingly, an additional fact justified

18   the subsequent stop and search of the Mustang: the ninety-nine pounds of marijuana found in the

19   Montero.  When police stopped the Mustang, they not only suspected that marijuana had been loaded

20   from the warehouse into the cars Britton drove (as when they stopped the Montero), they now knew it.

21   Therefore, agents had additional probable cause to stop Defendant Tran and search the Mustang.

22   Defendant Tran's argument that some additional showing was required to search the trunk is meritless.

23   For the foregoing reasons, Defendant Hao Quant Tran's Motion to Suppress the marijuana seized

24   from the Mustang is DENIED.

25   //

26   ORDER – 9

**III.    CONCLUSION**

Defendants' motions are DENIED in their entireties and the seized evidence may be used at trial.

SO ORDERED this 24th day of January, 2007.

John C. Coughenour

United States District Judge